**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 15-20080-01-JAR** |
| **STEPHEN M. NELSON,** | |
| **Defendant.** | |

**MEMORANDUM AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS**

This matter comes before the Court on Defendant Stephen M. Nelson's Motion to Suppress Evidence (Doc. 17). On December 15, 2015, the Court held an evidentiary hearing on the motion to suppress. Defendant filed a post-hearing brief on January 6, 2016, and the Government responded on January 29, 2016. Having reviewed the evidence and arguments presented by the parties, the Court is prepared to rule on Defendant's motion. For the reasons stated below, the Court denies Defendant's motion to suppress evidence.

I.      **Facts**

Based on the testimony and other evidence submitted at the suppression hearing, the Court finds the following facts by a preponderance of the evidence. On December 3, 2014, United States District Judge Kathryn H. Vratil issued an arrest warrant for Defendant Stephen M. Nelson based on violations of the terms of his supervised release in a separate case, 10-CR-20107-01-KHV. In January 2015, Deputy United States Marshals (DUSM) Jovan Archuleta contacted Antonio Bradley ("Mr. Bradley") to inform him that Defendant had an outstanding federal warrant. DUSM Archuleta encouraged Mr. Bradley to contact him if he saw Defendant. Defendant had an ongoing romantic relationship and had fathered a child with Mr. Bradley's

daughter, Alexandra ("Allie") Bradley. Mr. Bradley told DUSM Archuleta that he would notify him if he saw Defendant at the Bradleys' Kansas City, Kansas, home. Mr. Bradley knew that Defendant had stayed over at his house before because Allie and her child were living there. Mr. Bradley told Allie that he did not care for Defendant and that he did not want him staying at the house, but Mr. Bradley's wife, Ellena Bradley ("Ms. Bradley"), did not mind having Defendant in the house.

Late in the night on May 1, 2015, Allie Bradley left her parents' house and picked up Defendant to bring him back to the Bradleys' house to spend the night. When Ms. Bradley awoke on the morning of May 2, 2015, she saw Defendant in the kitchen microwaving food. That same morning, as Mr. Bradley was leaving the house, he saw Defendant on the porch. Mr. Bradley then called DUSM Archuleta and informed him that Defendant was at the house, and that the United States Marshals Service could go into the house to search for and arrest Defendant. Mr. Bradley explained that Allie Bradley's vehicle, a gray SUV, would likely be parked in front of the house and that if the vehicle was there, Defendant would probably still be in the house.

Later that morning, DUSM Archuleta notified DUSM Chris Johnson that he had spoken with Mr. Bradley, that Defendant was believed to be at the Bradleys' home, and that Mr. Bradley had given consent for the Marshals Service to search the house for Defendant. DUSM Archuleta explained that a gray SUV would likely be parked in front of the house if Defendant was still there. Based on this information, the Marshals Service verified that Defendant had an arrest warrant, set up a perimeter around the house, and conducted surveillance to confirm the presence of the gray SUV in front of the Bradleys' house. The Marshals Service also contacted the Kansas City, Kansas Police Department to request backup in effectuating the arrest. Before

proceeding to the house, DUSMs Johnson, Bradley Owens, and Michael Thibault, along with members of the Kansas City, Kansas Police Department ("KCKPD"), conducted a briefing at a bowling alley near the house.

DUSM Johnson led the group to the front of the house and knocked and announced the presence of the Marshals Service and KCKPD. After some time passed, Allie Bradley answered the door. DUSM Johnson stated that he was with the Marshals Service and that they were looking for Defendant. Allie responded that Defendant was in the house upstairs, and that she needed to go retrieve her child from downstairs.[1] Allie then attempted to close the door to the house, but DUSM Johnson placed his foot in the doorway to prevent her from shutting the door. After entering the house, the Deputy Marshals shouted phrases directed upstairs, such as "police," "come out with your hands up," and "arrest warrant." The Deputy Marshals heard no response and saw no one except for Allie.

While DUSM Johnson stayed on the third-floor landing, DUSMs Thibault and Owens escorted Allie downstairs to the second level so she could retrieve her child. Allie retrieved her child but remained on the couch in the second-level family room. DUSMs Thibault and Owens shouted "police" again toward the subbasement, but heard no response. DUSM Thibault noticed shadows moving at the bottom of the stairs in the subbasement. The Deputy Marshals continued shouting, and after about ten seconds Defendant appeared. DUSM Thibault arrested Defendant and placed him prone on the ground in handcuffs. DUSM Owens then went downstairs into the subbasement to secure the area, and DUSM Johnson came downstairs from the third level to assist DUSM Thibault on the second level. DUSM Johnson patted Defendant down for

---

[1] The Bradleys' residence is a split-level home with four levels. The top level has three bedrooms. The front door, where the Deputy Marshals entered, is on the third level of the home along with a kitchen, living room and dining room. The second level consists of a family room and garage, and stairs from this level descend to a subbasement where Allie Bradley was living.

weapons, but found none. Allie then explained to DUSMs Johnson and Thibault that her sixteen-year-old cousin was also in the house, but that she did not know where he was.

Meanwhile, DUSM Owens entered the subbasement and began searching for other people who could pose a potential threat to the officers. He noticed a bed with a pile of bedding and men's clothing lying on top. Concerned that someone might be lying underneath the pile of clothing and bedding, DUSM Owens went to the head of the bed and removed some of the items. Under the items, he found a Glock 17 semi-automatic handgun. DUSM Owens then called up to DUSM Johnson on the second floor and told him to come to the subbasement because he had found some items. DUSM Johnson joined DUSM Owens and a KCKPD officer to continue searching the subbasement rooms for anyone who could be concealed, but they found no one. Sometime after DUSM Owens found the Glock 17 handgun, DUSM Johnson informed him of the potential presence of Allie Bradley's cousin in the house. DUSM Thibault escorted Defendant out of the house at this time.

DUSM Owens then went outside the house to get an evidence collection kit out of his vehicle. Returning to the subbasement, DUSM Owens removed additional items from the bed before collecting the Glock 17 to prevent the items from moving the handgun. Upon removing these items, DUSM Owens found a second firearm, a Taurus Millennium nine-millimeter handgun. DUSM Owens collected both guns, and DUSM Johnson asked Allie Bradley who owned the guns. Allie stated that she did not know of the existence or ownership of the guns. The Deputy Marshals also asked Mr. and Ms. Bradley who owned the guns, and they similarly denied having ownership or knowledge of the guns.

## II.  Discussion

Defendant moves to exclude the evidence seized during the search of the subbasement. He contends that (1) he had a reasonable expectation of privacy in the Bradleys' home, and (2) that the Deputy Marshals exceeded the scope of their arrest warrant in searching the bed in the subbasement.

### A.  Standing

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[2] "Because Fourth Amendment rights are personal, a defendant 'may only claim the benefits of the exclusionary rule if [his] own Fourth Amendment rights have in fact been violated.'"[3] Thus, a defendant who seeks to challenge a search on Fourth Amendment grounds must first establish standing to challenge the search.[4] "Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'"[5]

In the context of house searches, the United States Supreme Court has held that an "overnight guest" has standing, while a person who is merely "legitimately on the premises" does not.[6] Merely occupying a room in a house overnight does not confer "overnight guest"

---

[2] U.S. Const. Amend. IV.

[3] *United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009) (quoting *United States v. Jarvi*, 537 F.3d 1256, 1259 (10th Cir. 2008)).

[4] *United States v. Poe*, 556 F.3d 1113, 1121 (10th Cir. 2009) (citing *United States v. Rubio-Rivera*, 917 F.2d 1271, 1274 (10th Cir. 1990)).

[5] *Id.* (quoting *United States v. Rhiger*, 315 F.3d 1283, 1285 (10th Cir. 2003)).

[6] *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990) (overnight guests possess an expectation of privacy in searched premises); *Rakas v. Illinois*, 439 U.S. 128, 140–49 (1978) (rejecting "legitimately on premises" test for standing requirement).

status on a defendant.[7]  Rather, a defendant must demonstrate a "degree of acceptance into the household" or an "ongoing and meaningful connection to [the host's] home."[8]

Defendant argues that he has standing to challenge the search because he was invited to the house by Allie Bradley, he stayed the night at the house, he had stayed over previously, and Ms. Bradley approved of him staying over.  The facts as the Court finds them, however, do not point so easily to the conclusion that Defendant enjoyed a reasonable expectation of privacy in the Bradleys' home.  Far from being an ordinary "overnight guest," it appears that Defendant was brought into the house by Allie Bradley late in the night or early in the morning to avoid the attention of her parents, particularly Mr. Bradley, who had told Allie that he did not want Defendant in the house.  Neither of the homeowners knew of Defendant's presence until the morning, and Mr. Bradley called the Marshals Service as soon as he saw Defendant.

Nevertheless, the Court finds that Defendant had a reasonable expectation of privacy in the Bradleys' home.  Defendant stayed most of the night over at the house, and he was invited by Allie Bradley, who was living at the house.  Defendant had a history of staying over at the house, and one of the two homeowners approved of him being there.  Although Mr. Bradley had voiced his opposition to Defendant being in the house, Defendant had at least a "degree of acceptance into the household."[9]  Therefore, the Court finds that Defendant has standing to challenge the search of the Bradleys' home.

---

[7] *See Long v. Roberts*, 277 F. App'x 801, 805 (10th Cir. 2008) (defendant who broke into friend's apartment without consent to enter the apartment on the night it was searched was not an "overnight guest"); *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1341–42 (N.D. Ga. 2009) (citing *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998)) ("Indeed, merely occupying a residence or room overnight does not establish a reasonable expectation of privacy in that place for Fourth Amendment purposes.").

[8] *Rhiger*, 315 F.3d at 1286 (citing *United States v. Carter*, 525 U.S. 83, 90 (1998)).

[9] *Id.*

### B. Protective Sweep

The Government contends that the search of the subbasement was lawful because it constituted a protective sweep. In *United States v. Buie*,[10] the Supreme Court recognized the protective sweep as an exception to the Fourth Amendment's general warrant requirement.[11] The Court stated that "a 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."[12] A protective sweep is permissible when officers "possess[ ] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ ] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others."[13] Further, a protective sweep must last no longer than necessary to dispel the "reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."[14]

Defendant argues that a protective sweep could not serve as the basis for the search because the Deputy Marshals relied on a blanket protective sweep policy rather than a reasonable belief that someone else was in the house when they conducted the search of the subbasement. At the hearing, DUSM Thibault testified that the Marshals Service has a policy of conducting such sweeps during every in-home arrest. Defendant argues that this policy was the basis for the search, and that such a policy violates the Fourth Amendment.

As for the statement of DUSM Thibault concerning a blanket policy of conducting protective sweeps, the Court cannot find that this alone requires suppression. Defendant cites the

---

[10] 494 U.S. 325 (1990).

[11] *Id.* at 333–37.

[12] *Id.* at 327.

[13] *United States v. Torres-Castro*, 470 F.3d 992, 996 (10th Cir. 2006) (quoting *id.*).

[14] *Id.*

Tenth Circuit case *United States v. Hauk*[15] for the proposition that "[t]he Fourth Amendment does not sanction automatic searches of an arrestee's home, nor does the fact-intensive question of reasonable suspicion accommodate a policy of automatic protective sweeps."[16]  However, the court in *Hauk* also emphasized that it is the existence of an objectively reasonable basis to conduct a search that determines whether the search is proper, not the existence of a legitimate subjective basis.  The court explained:

> If the government were relying on the validity of the Kansas City [blanket search] policy to support this protective sweep, or if the subjective motivations of the officers in undertaking the sweep were controlling, we would thus have to reverse this conviction . . . But the Supreme Court has squarely held that the legality of searches and seizures under the Fourth Amendment depends not on the subjective motivations of the police, but on whether there was an objectively reasonable basis for the search or seizure . . . Thus, the question here is not why the officers conducted the protective sweep of Mr. Hauk's home (apparently the answer to that is that they were following standard procedures), but whether the totality of the circumstances established a reasonable basis for them to do so.[17]

Thus, the alleged existence here of a blanket protective sweep policy is not determinative as to whether the search was lawful.  Instead, the Court must determine whether the totality of the circumstances demonstrate that the Deputy Marshals possessed a reasonable belief, on the basis of articulable facts, that they faced an imminent threat to their personal safety or to the safety of others.[18]

Here, the Deputy Marshals had information that would support a reasonable belief that someone else was in the house who could pose a danger to the Deputy Marshals or others.  When the Deputy Marshals first made contact with Allie Bradley, she attempted to shut the door and

---

[15] 412 F.3d 1179 (10th Cir. 2005).

[16] *Id.* at 1186.

[17] *Id.* (citing *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Abdenbi*, 361 F.3d 1282, 1292–93 (10th Cir. 2004), *cert denied*, 543 U.S. 864 (2004)).

[18] *Fishbein v. City of Glenwood Springs, Colo.*, 469 F.3d 957, 961 (10th Cir. 2006) (citing *United States v. Buie*, 494 U.S. 325, 327 (1990)).

stated that Defendant was upstairs. The Deputy Marshals later found out that Defendant was in fact downstairs in the subbasement. Additionally, the Deputy Marshals shouted several times for Defendant on the third and second levels and waited for a response, but did not receive an answer for several minutes. The lack of cooperation by Allie Bradley, the fact that Defendant was found downstairs when the Deputy Marshals had been told that Allie's child was the only person down there, and the lack of an initial response by Defendant to the Deputy Marshals' shouting suggest that they could have reasonably believed that someone other than Defendant was hiding in the house.[19] Thus, the Deputy Marshals were justified in performing a limited protective sweep of the subbasement once Defendant was arrested.

Further, the Court finds that DUSM Owens was justified in removing items from the bed once he was in the subbasement, which revealed the first gun. The bed was cluttered with bags, bedding, and other items, and DUSM Owens and other Deputy Marshals testified that based on their experience, people have hidden in beds under clothing and bedding to conceal themselves during house searches. Thus, DUSM Owens was properly concerned with removing the items on the bed to ensure that no one was hiding underneath.

Defendant also contends that the search was unlawful because it was conducted "after he had been arrested, handcuffed, and likely removed from the house."[20] The Court has found above that Defendant was not yet removed from the house when Deputy Owens began his search of the subbasement.[21] That the search occurred after Defendant was arrested and handcuffed is

---

[19] At some point, Allie Bradley told the Deputy Marshals that her sixteen-year-old cousin was also in the house. The testimony is unclear as to how many times Allie mentioned this or whether the Deputy Marshals learned about the cousin before they performed the search of the subbasement. As explained above, even without knowing about the cousin, the Deputy Marshals possessed a reasonable belief based on articulable facts that someone else could have been hiding in the house.

[20] Doc. 22 at 10.

[21] DUSM Thibault testified that he believed he removed Defendant from the house before DUSMs Owens or Johnson began searching the subbasement, but that he was unsure of this. DUSMs Johnson and Owens' testimony

not dispositive. The Court in *Buie* made clear that protective sweeps are proper "after, and while making, the arrest."[22] What is important is that the protective sweep occurs "incident to an arrest."[23] Here, the search of the subbasement occurred within moments of Defendant's arrest, and DUSM Owens found the first gun shortly after he began the search. The search was therefore an appropriate protective sweep that occurred incident to Defendant's arrest.

Finally, Defendant contends that even if the search for the first gun was lawful, the second gun must be suppressed because DUSM Owens unlawfully continued the search without a warrant. The Court finds that DUSM Owens' removal of the items on the bed and discovery of the second gun was proper. DUSM Owens testified that he removed the items in the course of collecting the first gun to prevent the items from interfering with the collection of the gun. His discovery of the second gun was inadvertent and pursuant to the valid collection of the first gun. Additionally, the removal of these items was part of the lawful protective sweep of the subbasement. For these reasons, the Court concludes that the collection of the second gun was lawful.

The Government also contends that the search was lawful based on the consent of Mr. Bradley and because the search constituted a search incident to a lawful arrest. Because the Court has found above that the search of the subbasement was a lawful protective sweep, the Court does not address whether Mr. Bradley's consent or the search incident to a lawful arrest doctrine provide independent bases for the search.

---

suggest that the subbasement search began while Defendant was still in the house. The Court thus finds that the search began before Defendant was removed from the house.

[22] *Buie*, 494 U.S. at 334.

[23] *Id.* at 327; *United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007) (citing *United States v. Torres-Castro*, 470 F.3d 992, 996–67 (10th Cir. 2006)).

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to

Suppress Evidence (Doc. 17) is **denied.**

**IT IS SO ORDERED.**

Dated: <u>March 3, 2016</u>

                               S/ Julie A. Robinson
                               JULIE A. ROBINSON
                               UNITED STATES DISTRICT JUDGE