# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

STEPHEN M. NELSON,

    Defendant.

Case No. 15-20080-01-JAR

## MEMORANDUM AND ORDER

This matter comes to the Court on remand from the Tenth Circuit, which vacated this Court's denial of Defendant's motion to suppress because the Tenth Circuit found that the protective sweep doctrine did not support the Deputy United States Marshal's search for Defendant's weapon.[1] The Tenth Circuit also remanded to this Court for further proceedings to "determine, on the basis of the evidence already in the record, whether the deputies exceeded the scope of [Antonio] Bradley's consent when they continued searching his residence after they arrested [Defendant]."[2] As described more fully below, the Court finds that the deputies exceeded the scope of Mr. Bradley's consent when they continued searching the house after Defendant's arrest. Accordingly, the Court grants Defendant's motion to suppress.

**I.     Relevant Facts**

In December 2014, Defendant's probation officer obtained an arrest warrant based on Defendant's violation of the terms of his supervised release in another case. Deputy United States Marshal ("DUSM") Jovan Archuleta contacted Antonio Bradley after learning that Defendant occasionally stayed at the Bradleys' home with Alexandra ("Allie") Bradley, Mr.

---

[1] *United States v. Nelson*, 868 F.3d 885, 893 (10th Cir. 2017).

[2] *Id.*

Bradley's daughter. DUSM Archuleta encouraged Mr. Bradley to contact him if he saw Defendant, and Mr. Bradley agreed.

On May 2, 2015, Mr. Bradley called DUSM Archuleta and informed him that Defendant was at the house. Mr. Bradley testified as follows concerning his conversation with DUSM Archuleta:

A. I told him he was over there.

Q. Okay.

A. Then he called me back. He said, "Well, I got somebody, is it okay?" I said, "Go on, you can go in the house."

Q. Okay. So you gave the U.S. marshals permission to go inside your house?

A. Uh-huh.

Q. And did you give the U.S. marshals permission to go in there and search for him and try to find him?

A. Yeah. I told them they can go find him. He's in my house.

Q. Okay. And with that authorization that you gave them, were you giving them authorization to do anything reasonable they needed to do to safely effectuate that arrest or to arrest Mr. Nelson if they needed to?

A. Yes

. . .

Q. Did you limit what the - - did you tell the U.S. marshals that they could and couldn't do certain things - -

A. No.

Q. - - in order to arrest Mr. Nelson?

A. No.

Q. Okay. Was it your understanding that your consent for them to go into your house and search for Mr. Nelson included anything that they needed to reasonably do to safely arrest Mr. Nelson?

A. True.[3]

Based on the information and consent Mr. Bradley provided, three DUSMs—Chris Johnson, Bradley Owens, and Michael Thibault—formed a task force to execute the arrest warrant with four Kansas City, Kansas police officers at the Bradleys' home. DUSMs Johnson, Owens, and Thibault each testified that they had been told by DUSM Archuleta that Mr. Bradley had given the deputies permission "to go in and arrest [Defendant]."[4] DUSM Johnson led the group to the front door of the house and knocked and announced the presence of the Marshals Service and KCKPD. The Bradleys' residence is a split-level home with four levels. The top level has three bedrooms. The front door is on the third level along with a kitchen, living room and dining room. The second level consists of a family room and garage, and stairs from this level descend to the first floor, or subbasement, where Allie Bradley was living.

After some time passed, Allie Bradley answered the door and said Defendant was in the house upstairs, and that she needed to go retrieve her child from downstairs. Allie then attempted to close the door to the house, but DUSM Johnson placed his foot in the doorway to prevent her from shutting the door. After entering the house, the deputy marshals determined that no one was on the fourth floor.

While DUSM Johnson stayed on the third-floor landing, DUSMs Thibault and Owens escorted Allie downstairs to the second level so she could retrieve her child. Allie retrieved her

---

[3]Doc. 51 at 14–15.

[4]Doc. 27 at 5; Doc. 51 at 33, 56–57, and 71.

child but remained on the couch in the second-level family room. DUSMs Thibault and Owens shouted "police" again toward the subbasement, but heard no response. DUSM Thibault noticed shadows moving at the bottom of the stairs in the subbasement. The deputies continued shouting, and after about ten seconds Defendant appeared. Defendant came up the stairs and DUSM Thibault arrested Defendant in the second-level family room and placed him prone on the ground in handcuffs. DUSM Owens then went downstairs into the subbasement, where he noticed a bed with a pile of bedding and men's clothing lying on top. DUSM Owens went to the head of the bed and removed some of the items. Under the items, he found a Glock 17 semi-automatic handgun.

## II. Discussion

A well-settled exception to the Fourth Amendment's warrant requirement is that law enforcement may search a home when its owner consents to the search.[5] "When law enforcement officers rely upon consent to justify a warrantless search, the scope of the consent determines the permissible scope of the search."[6] "The standard for measuring the scope of an individual's consent to search is that of 'objective reasonableness,' asking what the typical reasonable person would have understood to be the scope of his or her consent under the circumstances."[7] "The scope of a consent to search 'is generally defined by its expressed object, and is limited by the breadth of the consent given.'"[8]

---

[5]*United States v. Gillom*, -- F. Supp. 3d --, No. 16-cr-40059-01-DDC, 2017 WL 1234280, at *5 (D. Kan. Apr. 4, 2017) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Ruiz*, 664 F.3d 833, 839 (10th Cir. 2012); *United States v. Ruiz*, 664 F.3d 833, 839 (10th Cir. 2012)).

[6]*United States v. Marquez*, 337 F.3d 1203, 1207 (10th Cir. 2003) (citing *Florida v. Jimeno*, 500 U.S. 248, 251–52 (1991)).

[7]*United States v. Pena*, 143 F.3d 1363, 1367–68 (10th Cir. 1998) (quoting *Jimeno*, 500 U.S. at 251).

[8]*Id.* (quoting *United States v. Elliott*, 107 F.3d 810, 814–15 (10th Cir. 1997)).

Here, the express scope of the consent was that the deputies had permission to go in and search for and arrest Defendant. Mr. Bradley testified that he told the deputies they could "go find him," and the deputies understood that meant they could go into the Bradleys' home to search for and arrest Defendant.[9] Mr. Bradley also agreed in testimony that his consent included anything reasonable the deputies needed to do to safely arrest Defendant. But as the Tenth Circuit noted, "Bradley never stated whether that license extended beyond the time of Nelson's arrest."[10]

The Supreme Court has explained that "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose."[11] Here, the clear purpose of the requested consent was to search for and arrest Defendant. Although Mr. Bradley agreed at the hearing that his consent included anything reasonably necessary to effectuate the arrest, he did not state that the consent extended beyond the time of Defendant's arrest. Mr. Bradley's statement regarding the intent of his consent was tied to the subject of the search—Defendant's arrest. He did not testify that he provided—or intended to provide—consent for a limitless search in his house. Rather, he simply testified that while the deputies were carrying out their search for Defendant, they had his consent to do anything reasonably necessary to effectuate that search.

The circumstances surrounding the conversation between DUSM Archuleta and Mr. Bradley further confirm that Mr. Bradley's consent extended only to the search for and arrest of Defendant. DUSM Archuleta contacted Mr. Bradley and informed him that Defendant had outstanding arrest warrants, and he asked Mr. Bradley to contact him if he learned that

---

[9] *See supra* notes 3 and 4 and accompanying text.
[10] *United States v. Nelson*, 868 F.3d 885, 893 (10th Cir. 2017).
[11] *Florida v. Jardines*, 569 U.S. 1, 9 (2013).

5

Defendant was in the Bradleys' home. According to Mr. Bradley, when he saw Defendant entering his house, he called DUSM Archuleta and "told [him] Stephen was right at my house."[12] Thus, the entire course of communications between DUSM Archuleta and Mr. Bradley centered on the search for Defendant. DUSM Archuleta never put Mr. Bradley on notice that the deputies intended to search his house after they arrested Defendant, and Mr. Bradley never provided consent to search beyond that point. Under these circumstances, a reasonable person in Mr. Bradley's position would have understood that they were consenting to a search for Defendant, rather than a generalized search for evidence related to Defendant.

As Mr. Bradley's testimony reveals, he was eager to assist the deputies in their search for Defendant. He contacted DUSM Archuleta as soon as he saw Defendant entering his house, and promptly provided his consent to "go find him." Given this high level of cooperation, one can reasonably assume that Mr. Bradley may have given his consent to search his house for firearms or other items of evidence that Defendant may have left there had the deputies asked for this consent. But the Court is unwilling to define the scope of consent based on conjecture as to what Mr. Bradley *may* have been willing to consent to. Instead, the Court must look to the totality of the circumstances surrounding the consent that Mr. Bradley *actually* gave. Here, Mr. Bradley's consent related to a precisely defined goal—the search for and arrest of Defendant. Mr. Bradley testified that his consent extended to the fullest extent necessary for the deputies to achieve that goal. But once the deputies arrested Defendant, the consent ended because the "specific purpose" of the search had been achieved.[13] Accordingly, the deputies' search of the Bradleys' subbasement, after they arrested Defendant, exceeded the scope of Mr. Bradley's consent. On remand, the Court therefore grants Defendant's motion to suppress.

---

[12] Doc. 51 at 14

[13] *See Jardines*, 569 U.S. at 9.

6

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Suppress (Doc. 17) is **granted**.

**IT IS SO ORDERED.**

Dated: October 4, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE